IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| YANIRA RUIZ-LOPEZ, | ) | CASE NO.  1:15-cv-00169 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Yanira Ruiz-Lopez ("Plaintiff" or "Ruiz-Lopez") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.  As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Ruiz-Lopez protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on April 21, 2011.[1]  Tr. 14, 263-269.   Ruiz-Lopez alleged a disability onset date of June 15, 2009.  Tr. 14, 263.   She alleged disability due to diabetes, hirsutism, bipolar disorder, mental retardation, ADHD, high blood pressure, depression, and amenorrhea.  Tr. 101, 113, 127, 139, 154, 159, 167, 173, 282.   Ruiz-Lopez's application was denied initially and upon reconsideration by the state agency.  Tr. 153-161, 166-175.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 12/15/2015).

Thereafter, she requested an administrative hearing.  Tr. 181-182.  On July 9, 2013, Administrative Law Judge Eric Westley ("ALJ") conducted an administrative hearing.  Tr. 37-96.

In his November 1, 2013, decision, the ALJ determined that Ruiz-Lopez had not been under a disability at any time between the June 15, 2009, alleged onset date and the date of his decision.  Tr. 8-31.  Ruiz-Lopez requested review of the ALJ's decision by the Appeals Council.  Tr. 6-7.  On November 28, 2014, the Appeals Council denied Ruiz-Lopez's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

**A.     Personal, vocational and educational evidence**

Ruiz-Lopez was born in 1985.  Tr.  53.  She was born in Puerto Rico and moved to Ohio around 2010-2011.  Tr.  56-57.  At the time of the hearing, Ruiz-Lopez was residing with a friend of her mother's.  Tr. 55.  Ruiz-Lopez's mother lived nearby and Ruiz-Lopez saw her mother daily.  Tr. 56-57.  During high school, Ruiz-Lopez was in special education classes.  Tr. 53.  She graduated high school and, after attending cooking school for one year, obtained a cooking certification.  Tr. 53-54.  Ruiz-Lopez speaks Spanish.  Tr. 1362.  She does not speak or read English.[2]  Tr. 54.  While in Puerto Rico, Ruiz-Lopez worked with her mother cleaning homes.  Tr. 56.  Ruiz-Lopez stopped working because there was no more work for her and because of her health condition.  Tr. 59.

**B.     Medical evidence**

**1.     Treatment history**

---

[2] An interpreter was present at the hearing.  Tr.  39, 40.

On April 25, 2012, Ruiz-Lopez saw Patricia Grippi, MSN, APRN-B, of Signature Health, for a psychiatric evaluation.  Tr. 1288-1290.  Ruiz-Lopez's case manager, Olga Cardenas, BA, and Ruiz-Lopez's mother accompanied her to the evaluation.  Tr. 1288.  Ruiz-Lopez reported having severe depression, anger, aggression and some intermittent suicidal ideation.  Tr. 1288.  Ruiz-Lopez reported that some of her family remained in Puerto Rico and it was her wish that the whole family could be together.  Tr. 1288.  She reported having had suicidal and homicidal thoughts.  Tr. 1288.  She stated that "[s]he can hear people mumbling in her ear and at night sometimes sees a big black face coming at her."  Tr. 1288.  At times, Ruiz-Lopez becomes so angry and aggressive that she has thrown and broken things at home.  Tr. 1288.  Ruiz-Lopez has a past history of anorexia between the ages of 15 and 18.  Tr. 1288.  At the time of the evaluation, she was obese, weighing 202 pounds.  Tr. 1288.  Ruiz-Lopez has hirsutism, which has resulted in a masculine appearance and facial hair.  Tr. 1288.  Ruiz-Lopez sees an ugly man when she looks in the mirror which was very upsetting to her.  Tr. 1288.  She also suffers from severe diabetes.  Tr. 1288.  Ruiz-Lopez indicated that she had never been hospitalized psychiatrically but she had received outpatient treatment on and off since she was 15 years old.  Tr. 1289.

On mental status examination, Ms. Grippi indicated that Ruiz-Lopez was neat and clean; obese; showed a very constricted demeanor and frightened affect; insisted on sitting next to her mother and holding on to her for the entire evaluation; spoke no English and understood very little English; eye contact was fleeting; speech was spontaneous, coherent and relevant as she provided answers to the interpreter; her thought process was logical; she reported paranoia and auditory and visual hallucination; and she denied any current suicidal or homicidal ideation, plan or behaviors.  Tr. 1289.  Ms. Grippi's diagnoses included mood disorder, NOS; intermittent

explosive disorder; and mild mental retardation.  Tr. 1289.  Ms. Grippi assessed a GAF score of 50.[3]  Tr. 1290.  Ms. Grippi prescribed Seroquel to treat Ruiz-Lopez's psychosis and difficulty sleeping.  Tr. 1290.

Ruiz-Lopez saw Ms. Grippi on June 6, 2012, for medication management.  Tr. 1291-1292.  Ruiz-Lopez attended the visit with her mother who translated for her.  Tr. 1291.  The Seroquel was helping Ruiz-Lopez fall asleep but she was not sleeping through the night and woke up in a bad mood.  Tr. 1291.  Ruiz-Lopez indicated she had a great amount of anger and anxiety.  Tr. 1291.  She was bothered by other people and wanted to hurt them.  Tr. 1291.  She was having thoughts of jumping off a balcony.  Tr. 1291.  Ms. Grippi asked Ruiz-Lopez about a report that indicated that, while she was in Puerto Rico, she had been taking Risperdal and Depakote.  Tr. 1291.  Ruiz-Lopez indicated that she remembered the Depakote helping her with her anger.  Tr. 1291.  Ms. Grippi observed that Ruiz-Lopez was calm, pleasant and cooperative with her.  Tr. 1291.  She did not exhibit any high anxiety or anger.  Tr. 1291.  Her eye contact going back and forth between Ms. Grippi and her mother was fair.  Tr. 1291.  Ruiz-Lopez understood some English but spoke in Spanish to her mother.  Tr. 1291.  Her speech was spontaneous, coherent and relevant and her thought process appeared logical.  Tr. 1291.  Ruiz-Lopez was able to answer questions clearly.  Tr. 1291.  She knew her blood sugar numbers and that her primary care physician had increased her insulin.  Tr. 1291.  Ruiz-Lopez reported continued paranoia, believing that people were watching her.  Tr. 1291.  Her auditory

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*  The GAF was removed from DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

hallucinations had lessened since taking Seroquel.  Tr. 1291.  Although she continued to see a big black face coming at her, it was less frequent and less intensive.  Tr. 1291.  Ms. Grippi's diagnoses again included mood disorder, NOS; intermittent explosive disorder; and mild mental retardation.  Tr. 1291.  Ms. Grippi increased Ruiz-Lopez's Seroquel dose and ordered Depakote.  Tr. 1291.  Ms. Grippi indicated that, although Ruiz-Lopez was having feelings of anger, she believed that Ruiz-Lopez was at low risk for suicide or homicide.  Tr. 1291.

With her mother present, Ruiz-Lopez saw Ms. Grippi again on July 10, 2012, for medication management.  Tr. 1293-1294.  Ruiz-Lopez reported having some abdominal pain.  Tr. 1293.  She continued to be restless and was not sleeping for long periods of time but her anger and anxiety had decreased.  Tr. 1293.  She was less annoyed by other people and had no desire to hurt them.  Tr. 1293.  Ruiz-Lopez and her mother were planning a trip to Puerto Rico because her brother had been in a car accident.  Tr. 1293.  Ruiz-Lopez admitted that she was not compliant with taking her medication.  Tr. 1293.  Ms. Grippi noted that Ruiz-Lopez was very calm, pleasant and cooperative and there was no anger or anxiety.  Tr. 1293.  Ruiz-Lopez smiled often and was proud of her ability to understand a lot of what Ms. Grippi was saying.  Tr. 1293.  Ruiz-Lopez's eye contact was good.  Tr. 1293.  She reported less paranoia.  Tr. 1293.  She did not believe that people were watching her as much as before.  Tr. 1293.  Her auditory hallucinations were almost none and her visual hallucinations had abated.  Tr. 1293.  Ms. Grippi again assessed mood disorder, NOS; intermittent explosive disorder; and mild mental retardation.  Tr. 1293-1294.  Ms. Grippi indicated that Ruiz-Lopez's acute and chronic risk of harm to herself and others was low to moderate and noted that Ruiz-Lopez had improved her ability to control her temper and decrease her psychotic thinking.  Tr. 1294.  Ruiz-Lopez was hopeful about the possibility of more improvement.  Tr. 1294.  Ms. Grippi increased Ruiz-

Lopez's Seroquel because she was responding well to the medication.  Tr. 1294.  Ms. Grippi recommended discontinuing the Depakote because of the potential that it could cause increased liver function tests.  Tr. 1293-1294.

Following their trip to Puerto Rico, Ruiz-Luiz, with her mother, saw Ms. Grippi on August 23, 2012.  Tr. 1295-1296.  Ruiz-Lopez's mother reported that Ruiz-Lopez had a very difficult time while in Puerto Rico.  Tr. 1295.  Ruiz-Lopez had decided not to take her medication with her so she could see how she would do.  Tr. 1295.  Ruiz-Lopez's mood was terrible and she was fighting with everyone.  Tr. 1295.  The situation helped Ruiz-Lopez decide that she really needed her medications.  Tr. 1295.  Ruiz-Lopez was sleeping well at night with the Seroquel but her mother indicated that she thought there was a problem because Ruiz-Lopez did not want to wake up in the morning, which was a problem because Ruiz-Lopez's primary care physician wanted Ruiz-Lopez to wake early in the morning to have breakfast and take her insulin.  Tr. 1295.  Ruiz-Lopez admitted getting mad and yelling.  Tr. 1295.  However, she denied any paranoia; auditory or visual hallucinations; or suicidal or homicidal ideations.  Tr. 1295.  Ms. Grippi's diagnoses remained mood disorder, NOS; intermittent explosive disorder; and mild mental retardation.  Tr. 1295.  Ms. Grippi assessed Ruiz-Lopez's acute and chronic risk of harm to self or others as moderate.  Tr. 1295.  Ruiz-Lopez was willing to listen to Ms. Grippi and talk about various ideas for improving her situation.  Tr. 1296.  Ms. Grippi increased Ruiz-Lopez's Seroquel dose, with the hope that the increased dose would decrease Ruiz-Lopez's anger and verbal aggressiveness toward others.  Tr. 1296.

In October and November of 2012, Ruiz-Lopez attended therapy sessions with her case manager, Ms. Cardenas.  Tr. 1003-1012.  Ms. Cardenas urged Ruiz-Lopez to take more responsibility and practice independent skills.  Tr. 1012.  Ruiz-Lopez also met with Mattie

Dramis, M.Ed., LSW, PCC-SUPV, in November 2012 for individual counseling.  Tr. 1013.

Ruiz-Lopez indicated that she was hoping to move into her own place at Metro Housing or

Ashtabula Tower.  Tr. 1013.  At times she felt like she was a bother to the person she was living

with.  Tr. 1013.  Ruiz-Lopez reported that she was having a hard time with her symptoms.  Tr.

1013.  She reported that sometimes she was forgetting to take her medication or refusing to take

it because it was too much of a bother.  Tr. 1013.  Ruiz-Lopez relayed to Ms. Dramis that she felt

that her case manager was pushing her to become more independent but she did not like the

pressure.  Tr. 1013.  Ruiz-Lopez reported that, when she goes shopping, she is happy and there

are no symptoms.  Tr. 1013.  Ms. Dramis informed Ruiz-Lopez that keeping busy and doing

things that she liked was a great way to stop dwelling on her symptoms and find relief.  Tr. 1013.

### 2. Opinion evidence

#### Evelyn T. Rivera, Ph.D.

On July 11, 2011, psychologist Evelyn T. Rivera, Ph.D., met with Ruiz-Lopez for the

purpose of conducting a consultative psychological evaluation.  Tr. 774-778.  The interview was

conducted in Ruiz-Lopez's native language (Spanish).  Tr. 774.  Ruiz-Lopez's mother and a

friend of the family who was a case manager at a mental health agency in Ashtabula, Ohio and

who had been assisting Ruiz-Lopez with obtaining services were present at the evaluation.[4]  Tr.

774.  The evaluation consisted of a partial clinical interview with the Ruiz-Lopez as well as

interviews with her mother and Ms. Sanchez.  Tr. 774.  Dr. Rivera indicated that Ruiz-Lopez did

not appear to understand many of her questions so Ruiz-Lopez's mother and Ms. Sanchez

provided most of the information for the evaluation.  Tr. 774.  Ruiz-Lopez did not know and

could not explain why she was applying for social security disability.  Tr. 774.  She did not know

what day of the week it was or where she lived.  Tr. 774.  Ruiz-Lopez demonstrated a short

[4] The family friend referenced was Ana Sanchez.  Tr. 70.

attention span; she had an irritable mood throughout the interview; and she was unable to sit for more than five minutes.  Tr. 774.  Her behavior was disruptive and she threatened to hit her mother during the evaluation.  Tr. 774.  Ruiz-Lopez reported that she cried all the time and could not sleep.  Tr. 774.  Due to Ruiz-Lopez's disruptive behavior during the interview and her threats to her mother, Dr. Rivera had to ask Ms. Sanchez to take her outside so that Dr. Rivera could complete her interview with Ruiz-Lopez's mother.  Tr. 775.  Dr. Rivera noted that Ruiz-Lopez's mother appeared to be scared of her daughter.  Tr. 775.  Ruiz-Lopez's mother had left her daughter when her daughter was 22 because of her daughter's aggression.  Tr. 776.  However, Ruiz-Lopez was not doing well in Puerto Rico and later came to live with her mother in Ohio. Tr. 776.

Ruiz-Lopez's mother and Ms. Sanchez reported that Ruiz-Lopez had mental health problems, including ADHA, explosive/aggressive behavior, and bipolar disorder.  Tr. 744, 775. They also indicated that Ruiz-Lopez had been diagnosed with MRDD in first grade.  Tr. 774, 775.  Dr. Rivera indicated that medical records that were provided showed that Ruiz-Lopez had been diagnosed with generalized anxiety disorder and borderline intellectual functioning in November 2004 and major depressive disorder in 2009.  Tr. 775.  Ruiz-Lopez's mother reported that her daughter had not been on medication and had not seen a psychiatrist since moving to Geneva, Ohio, in September 2010.  Tr.  775.  Dr. Rivera noted that no psychological testing was requested or performed during the July 11, 2011, evaluation.  Tr.  777.

Dr. Rivera's mental health diagnoses included explosive intermittent disorder; major depressive disorder, recurrent, no psychotic features; rule or ADHD; rule out bipolar disorder;

borderline intellectual functioning (previously diagnosed); and rule out mild MRDD.  Tr. 777.
Dr. Rivera assessed an overall GAF score of 20.[5]  Tr. 777.

Dr. Rivera indicated that Ruiz-Lopez was unable to provide coherent or reliable
information.  Tr. 777.  Dr. Rivera indicated that both Ruiz-Lopez's mother and Ms. Sanchez
provided consistent descriptions of Ruiz-Lopez's behavior when they were interviewed
separately by Dr. Rivera.  Tr. 777.  Based on her observations and reports from Ruiz-Lopez's
mother and Ms. Sanchez, Dr. Rivera found that Ruiz-Lopez appeared to demonstrate impulse
control problems; aggressive behavior towards her mother; unprovoked yelling at neighbors and
strangers on the street; and inappropriate sexual touching and language in public.  Tr. 777.  Dr.
Rivera also found that Ruiz-Lopez appeared to have some serious cognitive limitations, possibly
related to borderline intellectual functioning or mild MRDD and some significant depressive
symptoms (insomnia, transient suicidal ideation, and irritability) indicative of major depressive
disorder.  Tr. 777.  Ruiz-Lopez was not receiving any psychiatric treatment at the time.  Tr. 777.

Dr. Rivera's functional assessment included her conclusions that (1) Ruiz-Lopez would
be expected to understand and apply instructions in a work setting consistent with borderline to
mild MRDD intellectual functioning, noting that Ruiz-Lopez's English was limited and at times
her language was incoherent and illogical; (2) Ruiz-Lopez's mood and behavior would
negatively impact her ability to perform work-related tasks; (3) Ruiz-Lopez would have
difficulty working well with co-workers and supervisors; and (4) Ruiz-Lopez's cognitive
limitations, disruptive and aggressive behavior, sexually inappropriate language and behavior in

---

[5] A GAF between 11 and 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimum hygiene (e.g., smears feces) or gross impairment in communication (e.g. largely incoherent or mute)." DSM-IV-TR at 34.

public, irritable mood, and inability to control her volatile mood and impulsive behavior would make it difficult for her to respond appropriately to work pressures in a work setting.  Tr. 778.

### James Cozy, M.A.

On November 7, 2011, psychologist James Cozy, M.A.,[6] completed an Ohio Job & Family Services' Mental Functional Capacity Assessment.  Tr. 800-801.   Mr. Cozy offered his opinion as to Ruiz-Lopez's functional abilities in 20 categories, with available rating choices of "not significantly limited," "moderately limited," "markedly limited," and "not rated."  Tr. 800. In 2 categories – ability to carry out very short and simple instructions and ability to carry out detailed instructions – Mr. Cozy rated Ruiz-Lopez moderately limited.  Tr. 800.  In 3 categories – ability to ask simple questions or request assistance, ability to respond appropriately to changes in the work setting, and ability to set realistic goals or make plans independently of others – Mr. Cozy rated Ruiz-Lopez not significantly limited.  Tr. 800.   In the remaining 15 categories, Mr. Cozy rated Ruiz-Lopez markedly limited.  Tr. 800.  As part of the Mental Functional Capacity Assessment, a narrative statement was included indicating that Ruiz-Lopez had not been employed since 2009 because of lack of employment; she demonstrated difficulty interacting with others and being responsible for being at work on time; and she had poor social skills and poor memory.  Tr. 801.

### David V. House, Ph.D.

After the administrative hearing, per the ALJ's request, on September 12, 2013, psychologist David V. House, Ph.D., met with Ruiz-Lopez for the purpose of conducting a consultative psychological evaluation.  Tr. 1362-1368.  Ruiz-Lopez's mother accompanied her to

---

[6] The record is not clear as to the extent of the treatment relationship between Mr. Cozy and Plaintiff.

the evaluation.  Tr. 1262.  The evaluation was conducted with the assistance of a Spanish

translator.  Tr. 1262.  Dr. House's summary and conclusions were as follows:

> Based on the information gathered during testing and interview session, it is my
> opinion, with reasonable scientific certainty, that Yanira Ruiz Lopez would suffer
> from a diagnosis of Autistic Spectrum Disorder.  She may be demonstrating some
> Asperger's function.  She seems highly limited and is highly socially limited and
> has some difficulties with verbal appropriateness.  Her condition appears chronic.

Tr. 1366.

Dr. House's functional assessment included his conclusions that: (1) Ruiz-Lopez was

unable to follow instructions with any real effectiveness; (2) Ruiz-Lopez would be unable to

follow multi-step directions, at least not on a consistent basis; (3) Ruiz-Lopez would be unable to

effectively conduct relationships with a fairly broad range of people, even coworkers or

supervisors; and (4) Ruiz-Lopez seemed to have significant difficulties functioning even in day-

to-day activities.  Tr. 1367.  Dr. House's diagnosis was autistic spectrum disorder and he

assessed a GAF score of 25.[7]  Tr. 1367.  He opined that Ruiz-Lopez's prognosis was poor and

her condition appeared chronic.  Tr. 1367.

Also, on September 18, 2013, Dr. House completed a Medical Source Statement of

Ability to Do Work-Related Activities (Mental) ("MSS").  Tr. 1359-1361.  In the MSS, Dr.

House rated Ruiz-Lopez's ability to understand, remember, and carry out instructions and ability

to interact appropriately with supervision, co-workers, and the public as well as respond to

changes in the routine work setting.  Tr. 1359-1360.  In all areas rated, Dr. House opined that

Ruiz-Lopez was markedly limited.  Tr. 1359-1360.  In the MSS, Dr. House opined that Ruiz-

Lopez's autistic spectrum disorder supported his assessments.  Tr. 1359-1360.  Dr. House also

---

[7]  A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or
serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal
preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)."
DSM-IV-TR at 34.

opined that Ruiz-Lopez's condition would impact her ability to perform activities of daily living. Tr. 1360.

## C.  Cooperative Disability Investigations Unit evidence[8]

On July 14, 2011, during review of Ruiz-Lopez's claim, Ohio Disability Determination Service (DDS) discovered areas of conflict in the medical evidence as compared to Ruiz-Lopez's statements regarding her alleged limitations. Tr. 105-106, 782. As a result, DDS referred Ruiz-Lopez's case to the Cleveland Cooperative Disability Investigations (CDI) Unit for an investigation. Tr. 782. The matter was opened for investigation on August 18, 2011. Tr. 782. On September 21, 2011, Special Agent Muniz and Detective Ted Sloan met with and interviewed Ruiz-Lopez at her residence. Tr. 785. In the CDI report submitted by Special Agent/CDI Unit Team Leader Kelly Clark[9] in October 2011, it is reported that, during their interview with Ruiz-Lopez, Special Agent Muniz and Detective Sloan noted and/or observed that Ruiz-Lopez did not appear unkempt; she had heavy facial hair; she was dressed in sleepwear; she did not appear to be anxious or depressed; she spoke clearly and concisely in Spanish; she answered all questions and asked her own; she seemed comfortable talking with the investigators as they discussed an unrelated law enforcement matter; she exhibited no problems with recollection of dates; her memory of events was good; she did not appear nervous, afraid, or delusional; she required no simplification of questions during the interview; she confirmed that she attended high school and culinary school in Puerto Rico; and at the time of the interview, Ruiz-Lopez was caring for several children. Tr. 780-788.

---

[8] During the hearing, Ruiz-Lopez's counsel questioned the reliability and admissibility of the CDI report 44-50. The ALJ indicated that he was not going to exclude the report. Tr. 50.

[9] The CDI report was "submitted" by Kelly Clark and "approved" by Elias Papoulias, Assistant Special Agent in Charge or Resident Agent in Charge. Tr. 786.

Following its review, DDS concluded that there was reason to believe that Ruiz-Lopez knowingly concealed and incorrectly provided information regarding the extent of her impairments.  Tr. 106-108, 159-160.  Therefore, DDS disregarded information that Ruiz-Lopez reported concerning her impairments, including the July 11, 2011, consultative examining psychologist report.  Tr. 108, 159-160.

**D.  Ashtabula County Board of Developmental Disabilities**

To qualify for services through the Ashtabula County Board of Developmental Disabilities, an applicant must have at least three substantial limitations in seven life areas that are assessed by the Ohio Eligibility Determination Instrument (OEDI).  Tr. 803.  The seven life areas evaluated were mobility; self-care; self-direction; capacity for independent living; learning; economic self-sufficiency; and receptive and expressive language.  Tr. 824.  A November 11, 2011, evaluation resulted in a finding that Ruiz-Lopez had a substantial limitation in only one area – self-direction.  Tr. 803, 812-814, 824.   Since Ruiz-Lopez did not demonstrate at least three areas of substantial limitations, on November 16, 2011, Ashtabula County Board of Developmental Disabilities notified Ruiz-Lopez that she was not eligible for services through the Ashtabula County Board of Developmental Disabilities.  Tr. 803.

**E.  Testimonial evidence**

**1.  Plaintiff's testimony**

Ruiz-Lopez was represented at and testified at the hearing with the assistance of an interpreter.  Tr. 52-68.  Ruiz-Lopez stated that she was not working.  Tr. 54.  She stated that sometimes there are children at the home where she is residing but indicated that she does not take care of children.  Tr. 54-55.  She indicated that she worked a while ago in Puerto Rico with her mother because she could not work alone.  Tr. 56.  She was unable to work alone because she

would forget everything.  Tr. 56.  Ruiz-Lopez also indicated that she had difficulties in the past working eight hours a day, five days a week because she would get tired a lot and her sugar levels would rise or drop.  Tr. 58.  She stated that she stopped working because there was no work for her and because of her health condition.  Tr. 59.

Ruiz-Lopez indicated that she depends upon her mother a lot but she also fights with her mother a lot.  Tr. 57.  Ruiz-Lopez stated that she is almost always angry.  Tr. 59.  She suffers from bipolar disorder and has mood swings.  Tr. 67.  She takes medication prescribed through Signature Health but she indicated that it was not helping that much.  Tr. 60.  She stated that her medication makes her tired.  Tr. 60, 67.  She stated that she fills her days watching television or listening to music.  Tr. 61.  She does not shower every day.  Tr. 65.  Sometimes her mother has to remind her to take a shower.  Tr. 65.  She usually stays in her pajamas all the time.  Tr. 65.  She stated that she was wearing her pajamas at the hearing.  Tr. 65.  She shops at the grocery store with her mother because she does not know how to do anything for herself.  Tr. 61.  She stated that she does not count change very well and so her mother pays for things at the store.  Tr. 62.  Ruiz-Lopez receives a food stamp card.  Tr. 63.  Her mother takes the card with them to the store. Tr. 63.

Ruiz-Lopez does not drive.  Tr. 61.  She took a driver's test once but was not able to pass the test.  Tr. 61.  Ruiz-Lopez's mother takes her to her doctor's appointments and reminds Ruiz-Lopez to take her medication.  Tr. 63-64.

Ana Sanchez, Ruiz-Lopez's case manager at Signature Health, helped Ruiz-Lopez complete her social security disability forms because she did not understand the forms mentally and because the forms were in English.  Tr. 59, 67.   Before Ms. Sanchez was assigned as Ruiz-Lopez's case manager, Ruiz-Lopez's case manager was Olga.  Tr. 67.

2.     **Ana Sanchez's testimony**[10]

Ana Sanchez testified at the hearing regarding her involvement with and observations regarding Ruiz-Lopez.  Tr. 68-85.  Ms. Sanchez indicated that she had been one of Ruiz-Lopez's assigned case workers at Signature Health and had assisted Ruiz-Lopez with completing the social security disability forms.  Tr. 69, 84.  Ms. Sanchez stated that she is an advocate for a lot of people in the Hispanic community outside her job and was assisting Ruiz-Lopez in that capacity as well.  Tr. 69-70.  Ms. Sanchez started working as Ruiz-Lopez's case manager on June 13, 2013, because Ruiz-Lopez's case manager Olga was out on leave.  Tr. 84.  Before taking over as Ruiz-Lopez's case manager, Ms. Sanchez confirmed with her boss that, even though Ms. Sanchez was already familiar with and had been assisting Ruiz-Lopez, there was no issue with her acting as Ruiz-Lopez's case manager.  Tr. 84.

Ms. Sanchez attended Ruiz-Lopez's consultative evaluation at Dr. Rivera's office on July 11, 2011.  Tr. 70.  Ms. Sanchez drove Ruiz-Lopez to the evaluation along with Ruiz-Lopez's mother and Pedro, the friend that Ruiz-Lopez lived with.  Tr. 71.  According to Ms. Sanchez, Ruiz-Lopez was arguing with her mother during the car ride to the evaluation.  Tr. 71.  At certain points during the car ride, Ruiz-Lopez wanted to hit her mother.[11]  Tr. 71.  Ruiz-Lopez was sitting in the back seat so Ms. Sanchez stopped the car and had Ruiz-Lopez sit in the front seat so Ms. Sanchez could try to distract her.  Tr. 71.

---

[10] Ruiz-Lopez called Ana Sanchez as a witness at the hearing to assist with filling in gaps since she had assisted Ruiz-Lopez with completing many social security disability forms and had observed Ruiz-Lopez at the consultative psychological evaluation.  Tr. 46-47.  At one point during Ms. Sanchez's testimony, the ALJ interrupted the questioning to ask Ruiz-Luiz what she was doing and, following his inquiry, he noted that "it appears that the claimant is drawing on the table with her finger, and erasing it and drawing it again."  Tr. 75.

[11] Ms. Sanchez has observed Ruiz-Lopez being angry and aggressive with her mother in the past.  Tr. 71-72.  Ruiz-Lopez and her mother live across the street from each other.  Tr. 71.  Ms. Sanchez indicated they stopped living together because of their arguments.  Tr. 72.

Once they arrived for the evaluation, they had to wait for about an hour for Dr. Rivera, which caused Ruiz-Lopez to become frustrated.  Tr. 73.  During Dr. Rivera's evaluation, Ruiz-Lopez became aggressive towards her mother and Ms. Sanchez had to take Ruiz-Lopez outside to calm down.  Tr. 72.  While outside, Ms. Sanchez indicated that Ruiz-Lopez acted very inappropriate by exposing her breasts and trying to pull Ms. Sanchez's shirt down.  Tr. 73.  Ms. Sanchez got Ruiz-Lopez back in the building, got her something to eat, and sat her down and tried to explain to Ruiz-Lopez why she could not do what she had done outside.  Tr. 73.  Because she had seen Ruiz-Lopez act out in the past in a sexually inappropriate manner, Ms. Sanchez did not believe that Ruiz-Lopez was trying to "play the system" by acting out at the evaluation.  Tr. 73-75.

Ruiz-Lopez's counsel asked Ms. Sanchez, in her capacity as a case worker, and having worked with Ruiz-Lopez, whether she had an opinion as to Ruiz-Lopez's functional limitations in terms of being able to work competitively, even at a simple job, 8 hours a day, 5 days a week. Tr. 83-84.  Ms. Sanchez indicated that at one point she thought about having her go through vocational rehabilitation but did not believe that Ruiz-Lopez could work 8 hours a day, 5 days a week. Tr. 84-85.   She thought that Ruiz-Lopez might do okay at first but with too many people she would become angry and act out.  Tr. 85.

### 3.    Vocational Expert's testimony

 Vocational Expert ("VE") Carmine Abraham testified at the hearing.  Tr. 85-93.  The ALJ indicated that he did not think that there was any past relevant work and proceeded with a hypothetical.  Tr. 86.  The ALJ asked the VE to assume a hypothetical individual of Ruiz-Lopez's age and education who could perform work at all exertional levels but would be limited to simple tasks, could not work at a production pace, but could perform goal oriented work,

interaction with supervisors would be limited to speaking and signaling, could not interact with the public and generally needed a static work setting but could tolerate a few changes.  Tr. 86-87.  The VE indicated that there were jobs in the economy that the described individual could perform, including (1) packager, a medium, unskilled job with 1,720 positions available in the region and 20,530 in the state; (2) housekeeper or cleaner, a light, unskilled job with 1,230 positions available in the region and 29,340 in the state; and (3) laundry worker, a light, unskilled job with 980 positions available in the region and 12,270 in the state.  Tr. 87.

Ruiz-Lopez's counsel asked the VE whether a limitation of no ability to read or speak English would change her response to the ALJ's hypothetical.  Tr. 88.  The VE indicated that the additional limitation would not change her opinion regarding the availability of the three listed positions because, in today's economy, with the types of jobs identified, there are many employers who hire Spanish speaking individuals.  Tr. 89.  The VE further explained that the jobs identified are entry level positions that do not require extensive reading or writing and could be learned through a short demonstration.  Tr. 89-90.  The VE clarified that an employer's hiring of a Spanish speaking individual did not amount to a special accommodation because the employer is not really changing the work environment.  Tr. 90.  Ruiz-Lopez's counsel asked the VE whether her opinion was consistent with the DOT which requires a certain amount of English to be spoken.  Tr. 91.  The VE indicated that, although the DOT requires English, things change over time and in today's economy there is such an influx of people that speak Spanish.  Tr. 91.  Thus, the VE indicated that her opinion was consistent with the DOT along with her experience in working with Spanish speaking individuals in the economy.  Tr. 91, 93.

Ruiz-Lopez's counsel then modified the hypothetical, asking whether there would be jobs available to an individual with marked limitations in her ability to perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances.  Tr. 91-92.

The VE stated that, if an individual was off task over 20 percent of the time or if she was unable

to maintain attendance and was missing one to two days a month on a consistent basis, the

person would likely be unemployable.  Tr. 92.

Ruiz-Lopez's counsel then asked whether there would be jobs available to a hypothetical

individual who had marked limitations in her ability to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes.  Tr. 92.  The VE stated that, if an

individual was unable to work with people even on an occasional basis, said individual would

likely be unable to function in a work environment.  Tr. 92.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[12] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

---

[12] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[14] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his November 1, 2013, decision, the ALJ made the following findings:[15]

---

[13] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[14] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[15] The ALJ's findings are summarized.

1.      Ruiz-Lopez was insured for a period of disability and disability insurance benefits on June 15, 2009, the alleged onset date, and she remained insured for these benefits through June 30, 2010.  Tr. 17.

2.      Ruiz-Lopez had not engaged in substantial gainful activity since the June 15, 2009, alleged onset date.  Tr. 17.

3.      Ruiz-Lopez had the following severe impairments: borderline intellectual functioning and an affective disorder.  The following were non-severe impairments: diabetes mellitus, hypertension, ovarian cysts, pancreatitis, gastroesophageal reflux disease, a condition causing excess hair, including on the face; neck, back and knee problems, being overweight, autism and, autistic spectrum disorder.[16]  Tr. 17-21.

4.      Ruiz-Lopez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 21.

5.      Ruiz-Lopez had the RFC to perform work without any exertional limitations but subject to the following non-exertional limitations/restrictions: limited to simple tasks; unable to work at a production pace but could perform goal oriented work; interactions with supervisors and coworkers limited to speaking and signaling; unable to interact with members of the public; and required a generally static work setting but could tolerate a few changes.  Tr. 21-25.

6.      Ruiz-Lopez had no past relevant work.  Tr. 25.

7.      Ruiz-Lopez was considered to be a younger individual in the 18-49 age group since the June 15, 2009, alleged onset date.  Tr. 25.

8.      Ruiz-Lopez had a limited education in learning disability classes and was unable to communicate in English.  Tr. 25.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 25.

10.     Considering Ruiz-Lopez's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Ruiz-Lopez could perform, including packager, housekeeper, and laundry worker.  Tr. 25-26.

---

[16] The ALJ acknowledged that Dr. House had diagnosed Ruiz-Lopez with autistic spectrum disorder but, since no other medical source had diagnosed Ruiz-Lopez with autism or autistic spectrum disorder, and since there was no evidence that Ruiz-Lopez was considered to have such disorders while a student, the ALJ found that there was insufficient evidence to establish the disorder.  Tr. 18.  However, the ALJ indicated that, although the evidence did not establish that autism or autistic spectrum disorder was a severe impairment, he would still consider the functional evidence.  Tr. 18-19.

Based on the foregoing, the ALJ determined that Ruiz-Lopez had not been under a disability since June 15, 2009, the alleged onset date.  Tr. 26.

## V. Parties' Arguments

Ruiz-Lopez argues that the ALJ erred by failing to discuss or weigh the opinion of Ana Sanchez.  Doc. 16, pp. 12-13, Doc. 19, p. 1.  She contends that Ms. Sanchez is an "other source" and therefore, under SSR 06-03p, the ALJ should have considered and generally explained the weight provided to Ms. Sanchez's opinion that was offered during the administrative hearing.  Doc. 16, pp. 12-13, Doc. 19, p. 1.

In response, the Commissioner argues that Ruiz-Lopez overstates Ms. Sanchez's professional relationship with Ruiz-Lopez.  Doc. 18, pp. 9-10.  The Commissioner asserts that Ms. Sanchez was only assigned to act as Ruiz-Lopez's case manager at Signature Health a few weeks prior to the July 9, 2013, administrative hearing and therefore, prior to that time, Ms. Sanchez was not acting in a professional capacity but rather in her capacity as a family friend.  Doc. 18, pp. 9-10.   The Commissioner further argues that there was no need for the ALJ to address Ms. Sanchez's opinion because Ruiz-Lopez failed to demonstrate that Ms. Sanchez was an "other source" under the Regulations and because Ms. Sanchez was not the type of objective source that could provide an opinion because her friendship with Ruiz-Lopez caused a potential conflict.  Doc. 18, pp. 9-10.

Ruiz-Lopez also argues that the ALJ erred in assigning "little weight" to mental health opinions rendered by Dr. Rivera, Mr. Cozy, and Dr. House.  Doc. 16, pp. 13-17, Doc. 19, p. 2.  Ruiz-Lopez argues that the three mental health opinions were consistent with each other and discounting them based on a CDI Unit report that was of little probative value was error.  Doc. 16, pp. 13-17, Doc. 19, p. 2.

The Commissioner contends that the ALJ properly evaluated and discounted the opinions of Dr. Rivera, Mr. Cozy, and Dr. House that contain very significant limitations and the record, when viewed as a whole, demonstrates that Ruiz-Lopez is more engaged than as reported in the opinions.  Doc. 18, pp. 10-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.    Reversal and remand is not warranted for further consideration of evidence presented by Ms. Sanchez**

Ruiz-Lopez contends that, contrary to SSR 06-03p, the ALJ did not discuss or weigh Ms. Sanchez's opinion and the ALJ's decision does not allow this reviewing Court the ability to follow the ALJ's reasoning with respect to evidence offered by Ms. Sanchez.

Under SSR-06-03p, an ALJ must "consider all relevant evidence in an individual's case record."  SSR 06-03p - *Considering Opinions and Other Evidence from Sources Who are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, 2006 WL 2329939, *6 (August 9, 2006). Further, "'[n]on-medical sources' who have had contact with the individual in their professional capacity, such as . . . social and welfare agency personnel who are not health care providers, are . . . valuable sources of evidence for assessing impairment severity and functioning." *Id.* at *3.  In addition, "evidence provided by other 'non-medical sources' such as . . . friends . . . and neighbors" is considered.  *Id.*   The case record should reflect the consideration of opinions from . . . 'non-medical sources' who have seen the claimant in their professional capacity [and] [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.*

The opinion that Ruiz-Lopez contends the ALJ erroneously failed to weigh was provided by Ms. Sanchez at the hearing in response to questioning from Ruiz-Lopez's counsel.  Tr. 83-84. In particular, at the hearing, the following exchange occurred:

> Q Given your background as a case worker for individuals that have mental health impairments - - and I realize you are not a psychologist, but in your capacity as a case worker, do you, in your limited sphere, having worked so closely with

Yanira, do you have an opinion as to whether she would have any functional limitations?

A [INAUDIBLE] I'm sorry.

Q In terms of being able to work competitively, even at a simple job, eight hours a day, five days a week?

A Yes; I don't believe that she would be able to do a job five or eight hours.  At one point I had thought - - I just received her - - Olga was her other, her case manager at Signature Health.  However, Olga is out on medical leave until August . . . one though[t] of mine was to take her to the BVR.  However I don't think that she would do well because at the BVR Mr. Steven Jacobs . . . . usually send[s] his clients to the Goodwill to do an assignment, work assignment there.

ALJ: Mm-hmm.

WTN: So that the supervisors there can in return come back and say how they were doing.  There's too many people.  I think that she would get angry.  I think that she would act out.  Maybe at first she would be okay.  She's okay sometimes.  I mean she seems she's okay, sometimes.  And then she'll turn into this different - -

ALJ: Okay.

WTN: Person, I guess.

ALJ: All right.

ATTY: Thank you.  I have no further questions.

Tr. 83-85.

To the extent that Ms. Sanchez was offering her opinion that Ruiz-Lopez was

unemployable, such an opinion is an issue reserved to the Commissioner.  *See Bass v. McMahon*,

*499 F.3d 506, 511 (6th Cir. 2007)* ("[T]he conclusion of disability if reserved to the Secretary.").

Furthermore, contrary to Ruiz-Lopez's claim, the ALJ considered evidence from Ms. Sanchez

and the ALJ's discussion of the evidence allows this Court the opportunity to review the ALJ's

reasoning with respect to the evidence offered by Ms. Sanchez.

Ms. Sanchez testified that she assisted Ruiz-Lopez with completion of various reports, including reports identified in the record as Exhibits 3E, 4E, and 7E. Tr. 69. Ms. Sanchez indicated that, at the time she completed the forms, she was aware of Ruiz-Lopez's mental and physical limitations based on her own observations, information provided by Ruiz-Lopez's mother, and information contained in school and medical records. Tr. 69-70. The ALJ's decision reflects the ALJ's acknowledgement that Ms. Sanchez provided testimony at the hearing in support of Ruiz-Lopez. Tr. 14. When discussing and weighing the evidence, the ALJ clearly stated that he was giving "little weight to the allegations/observations" included in reports prepared by Ms. Sanchez. Tr. 19 (citing among the exhibits, Exhibits 4E and 7E, which, as noted above, were identified by Ms. Sanchez at the hearing as having been completed by her (Tr. 69). Further, the ALJ stated that he was also giving "little weight . . . to the most extreme allegations that were made about the claimant's mental health during her hearing . . ." Tr. 19-20. The ALJ's decision makes clear that he considered and weighed Ms. Sanchez's testimony. Tr. 20 ("While the undersigned finds that the claimant and her mother and *her advocate* have exaggerated the severity of the claimant's mental problems . . .) (emphasis supplied).

Based on the foregoing, it is clear that the ALJ considered evidence presented by Ms. Sanchez and explained that he was providing little weight to that evidence, which suggested a disabling impairment. In doing so, the ALJ relied upon the CDI Unit report which presented a different, less extreme, picture of Ruiz-Lopez's mental functional abilities. Tr. 19-20. To the extent that Ruiz-Lopez suggests that the CDI Unit report should not have been considered or relied upon by the ALJ because it is unreliable or lacks credibility, this Court, in reviewing the Commissioner's decision, "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Further, the ALJ did not rely solely

on the CDI Unit report in reaching his decision.  As indicated in his decision, the ALJ considered

other record evidence, including Ruiz-Lopez's past mental health treatment which, other than the

consultative examinations, did not reveal significant mental health issues and a report from the

Ashtabula County Board of Developmental Disabilities finding that Ruiz-Lopez was not eligible

for services through that Board.  Tr. 20.

 Here, the ALJ did not disregard evidence presented by Ms. Sanchez and he sufficiently

explained the reasons for providing little weight to that evidence.  Accordingly, reversal and

remand is not warranted for further consideration of evidence presented or offered by Ms.

Sanchez.

**B.** **The ALJ properly considered the medical opinion evidence**

 Ruiz-Lopez argues that the ALJ erred in his consideration of the opinions of three

consultative examining psychologists Dr. Rivera, Mr. Cozy, and Dr. House.  Doc. 16, pp. 13-17,

Doc. 19, p. 2.  She asserts that there is a strong consistency among the three opinions, the

opinions were rendered by board-certified psychologists, and the opinions contain acceptable

medical findings.  Doc. 16, pp. 14-15.  Therefore, she argues that the ALJ should have assigned

considerable weight to the opinions.  Doc. 16, pp. 14-15.  She also contends that the ALJ's only

basis for discounting the opinions was the CDI Unit report and asserts that the CDI Unit report

does not provide an adequate basis for discounting the medical opinions.  Doc. 16, pp. 15-17,

Doc. 19, p. 2.

 The Regulations make clear that a claimant's RFC is an issue reserved to the

Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of

record. 20 C.F.R. §§ 404.1545(a); 404.1546(c).  It is the responsibility of the ALJ, not a

physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc.*

*Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

As one-time examining consultative psychologists, Dr. Rivera, Mr. Cozy, and Dr. House, did not have an ongoing treatment relationship with Ruiz-Lopez and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).  It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  *See* 20 C.F.R. § 404.1527(c).  Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Id.*  However, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Although Dr. Rivera, Mr. Cozy, and Dr. House were not treating source providers, the ALJ's decision, consistent with the regulations, the ALJ's decision makes clear that the ALJ considered their opinions and explained the weight assigned to their opinions, stating:

> In assessing the claimant's residual functional capacity, the undersigned has also considered the various medical source opinions that have been offered in this matter.  The residual functional capacity the undersigned has assigned for the claimant is supported by the report of the above-mentioned investigation that was conducted in this matter (**see** 8F), and by the case summaries that were respectively prepared on July 14, 2011 (**see** Ex. 5E) and October 25, 2011 (**see** Ex. 1A).  The undersigned has also considered the opinions offered by the above-mentioned consulting psychologist who evaluated the claimant on July 11, 2011 at the request of the Commissioner (**see** Ex. 7F, pps. 4 and 5); and the opinions offered by the above-mentioned consulting psychologist who evaluated the

27

claimant at the undersigned's request on September 12, 2013 (see Ex. 27F, pp. 1, 2, and 9); and the opinions of a consulting psychologist found in pages five and six of exhibit 10F. However, to the extent it is argued that the most extreme/restrictive opinions offered by these sources support a finding that the claimant's mental residual functional capacity has been more restricted than the undersigned is finding, such arguments are rejected on the ground that the longitudinal record, including the evidence that has already been cited to in this decision, does not support a more restrictive mental residual functional capacity over any continuous 12-month period since May 19, 2009.

Tr. 24.

The foregoing makes clear that the ALJ did not rely solely on the CDI Unit report when considering and weighing the opinions of Dr. Rivera, Mr. Cozy, and Dr. House. As is clear, the ALJ considered the supportability of the opinions with the other evidence of record and found that the bulk of the evidence did not support the extreme/restrictive opinions offered by the one-time consultative psychologists. As set forth in the Regulations, supportability of a medical opinion and length of treatment relationship are appropriate factors to consider when weighing an opinion. *See* 20 C.F.R. § 404.1527(c). To the extent that Ruiz-Lopez claims that the ALJ's decision lacked detailed analysis of each separate factor under 20 C.F.R. § 404.1527(c), that argument is unpersuasive because, even when an opinion being considered was rendered by a treating physician, which is not the situation in this case, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis. *See Francis*, 414 Fed. Appx. at 804.

To the extent that Ruiz-Lopez argues that the ALJ should have excluded or not provided much weight to the CDI Unit report because it lacks specificity or was based on an investigation conducted by non-mental health professionals in a different environment than the July 2011 consultative evaluation, which may have resulted in a different presentation by Ruiz-Lopez, her argument amounts to a request that this Court reweigh evidence already considered by the ALJ,

which this Court may not do.  *See Garner*, 745 F.2d 383, 387 (6th Cir. 1984) (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

Based on the foregoing, the Court finds that the ALJ sufficiently explained the weight assigned to the opinions of the three one-time consultative psychologists and Ruiz-Lopez has not shown that the decision is not supported by substantial evidence.  Accordingly, reversal and remand is not warranted for further consideration of the medical opinion evidence.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: December 18, 2015

Kathleen B. Burke
United States Magistrate Judge

29